JUDGE KAPLAN

'08 CIV 5654

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

BERKS COUNTY EMPLOYEES'
RETIREMENT FUND, on behalf of itself and
others similarly situated shareholders of
First American Corporation,

      Plaintiff,

v.

FIRST AMERICAN CORPORATION,
PARKER S. KENNEDY, FRANK V.
MCMAHON,

      Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)

CIVIL ACTION NO.



Jury Trial Requested

## CLASS ACTION COMPLAINT

Plaintiff, Berks County Employees' Retirement Fund ("Plaintiff"), alleges the following based on the investigation of Plaintiff's counsel, which included, among other things, a review of the defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission (the "SEC") filings, wire and press releases published by and regarding First American Corporation ("First American" or the "Company"), securities analysts' reports and advisories about the Company, the complaint filed by the Attorney General of the State of New York against the First American Corporation, and other research and information.

## I.   NATURE OF THE ACTION

1.   This is a federal securities class action brought by Plaintiff on behalf of all purchasers of the publicly traded securities of First American between April 26, 2006 and November 6, 2007 (the "Class Period"). The complaint seeks to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.     First American, which is headquartered in Santa Ana, CA, provides business information and related products and services.  It provides real estate appraisals, among other services.  First American has provided hundreds of appraisals for mortgages issued by offices in this District.

3.     During the Class Period, First American, through its real estate appraisal subsidiary, eAppraiseIT, provided 260,000 appraisals to Washington Mutual, Inc. ("Washington Mutual" or "WaMu").  eAppraiseIT provided real estate appraisal services to Washington Mutual on mortgages and "second lien" home loans, such as home equity loans and home equity lines of credit.  Washington Mutual is the nation's largest savings and loan bank and was eAppraiseIT's largest customer.

4.     To enable WaMu to engage in real estate mortgage transactions that would have been untenable had the property at issue been correctly appraised, eAppraiseIT, at WaMu's urging, provided materially false and inflated appraisals for properties where WaMu sought to originate a mortgage.  Senior executives at First American were aware of and willing to accommodate the request to falsify appraisals.  Washington Mutual's competitive place in the market, and company, profit was driven in large part by the number of mortgages it issued based upon appraisal issued by eAppraiseIT.

5.     On November 1, 2007, the New York Attorney General filed a complaint ("NYAG Complaint") alleging that beginning in "Summer 2006" WaMu put pressure on eAppraiseIT to increase the appraised value of homes:

>    First American and eAppraiseIT have abdicated their role in providing "third-party, unbiased valuations" for eAppraiseIT's largest client, WaMu. Instead, eAppraiseIT improperly allows WaMu's loan production staff to hand-pick appraisers who bring in appraisal values high enough to permit WaMu's loans to close, and improperly permits

WaMu to pressure eAppraiseIT appraisers to change appraisal values that are too low to permit loans to close. eAppraiseIT compromises its independence even while publicly touting that independence, and despite myriad warnings from its senior management team about the illegal collusion inherent in the compromises it is making. Instead of preserving its independence, which would have protected consumers and business customers alike, eAppraiseIT chose to protect only itself. And senior executives at First American, though warned by eAppraiseIT's senior management of its compromised independence, nonetheless directed eAppraiseIT to continue its wrongful conduct.

6.     Throughout the Class Period, Defendants failed to disclose the undue and improper pressure placed on First American by Washington Mutual executives in attempt to obtain higher appraisal values. As stated in the NYAG Complaint, such inflated appraisals create an enhanced risk of "loss of value in a foreclosure proceeding."

7.     Defendants' improper appraisal practices during the Class Period (1) rendered the Company's statements about its compliance with ethical and legal guidelines materially false and misleading; (2) rendered Defendants' statements about the adequacy of the Company's internal controls materially false and misleading; (3) were not disclosed and thus constitute an ongoing omission of material fact related to the Company's core home appraisal business; (4) caused certain of the Company's reported financial information, including revenues associated with home appraisal, to be materially overstated throughout the Class Period; (5) caused the Company's loan loss reserves, provisions for doubtful account and contingent liabilities to be materially understated during the Class Period; and (6) caused Defendants to report financial results that were in violation of GAAP.

8.     As a result of the disclosure of First American's wrongdoing, First American's stock price has declined significantly, culminating with a drop to a 52-week

low.  On November 1, 2007, following the announcement of the NYAG Complaint, First American's stock price dropped intra-day to a new 52-week low of $28.69 per share from its previous close of $30.10 per share on October 31, 2007.  As the market became aware of Defendant's wrongful acts, First American's stock price declined from a Class Period high of $55.11 per share on June 1, 2007, to a low of $30.07 per share on November 7, 2007, a decline of 45 percent, wiping out over $2 billion in market capitalization.

## II.    JURISDICTION AND VENUE

9.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b), 78n(a) and 78t(a), and Rule l0b-5 promulgated thereunder.  17 C.F.R. § 240.10b-5.

10.    This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1331.

11.    Venue is proper in this judicial district pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b).  Certain of the acts and transactions alleged herein occurred in substantial part in this judicial district, First American has a substantial presence in this judicial district and the NYAG Complaint was filed in this judicial district in the Supreme Court of the State of New York, County of New York.

12.    In connection with the acts, conduct and other wrongs alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

### III.   THE PARTIES

13.   Plaintiff is a pension fund for Berks County, Pennsylvania, chartered under the laws of Pennsylvania, with its headquarters in Reading, Pennsylvania.  As set forth in the attached Certification set forth as Exhibit A, Plaintiff purchased First American securities during the Class Period at artificially inflated prices, suffered a loss proximately caused by Defendants, and was damaged thereby.

14.   Defendant First American Corporation is a California corporation, with its principal place of business located at 1 First American Way, Santa Ana, California. According to its Annual Report for 2006 on Form 10-K, filed with the SEC on March 1, 2007, First American provides business information and related products and services. The Company has five reporting segments that fall within two primary business groups, financial services and information technology.  The financial services group includes the Company's title insurance and services segment and its specialty insurance segment.  The Company's information technology group includes the Company's mortgage information, property information and credit screening segments.

15.   The property information segment licenses and analyzes data relating to real property, offers risk management and collateral assessment analytics and provides database management and appraisal services. First American provides appraisal services to mortgage lenders, real estate agents, investors and other businesses requiring valuations of real property through its wholly owned subsidiary, First American eAppraiseIT LLC ("eAppraiseIT").  These services include traditional appraisals, which require physical inspection and human analysis, broker price opinion services, which value real property based on the opinions of real estate brokers and agents, and automated

valuation models, which use data and sophisticated mathematical models and analytic tools to arrive at a valuation.

16.     Parker S. Kennedy ("Kennedy") is, and was at all times relevant hereto, Chief Executive Officer and Chairman of the Board of First American Corporation, and a member of the Executive Committee.  As provided in Form 8-K, filed on January 9, 2007, Kennedy was paid a salary of $750,000 for 2007, a cash bonus of $912,500, restricted stock units worth $912,500, and long term incentive compensation worth $750,000, for total cash and stock compensation of $3,325,000.  Kennedy's large holdings of First American stock and options meant he had a direct financial incentive to inflate the stock price during the Class Period.

17.     Frank V. McMahon ("McMahon") is, and was at all times relevant hereto, Vice Chairman of the Board and Chief Financial Officer of First American Corporation, and a member of the Executive Committee.  McMahon oversees all aspects of First American's corporate finance, strategic planning and investor relations functions.  As provided in Form 8-K, filed on January 9, 2007, McMahon was paid a salary of $700,000 for 2007, a cash bonus of $875,000, restricted stock units worth $875,000, and long term incentive compensation worth $700,000, for total cash and stock compensation of $3,150,000.  McMahon's large holdings of First American stock and options meant he had a direct financial incentive to inflate the stock price during the Class Period.

18.     Defendants Kennedy and McMahon are collectively referred to hereinafter as the "Individual Defendants."  The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of First American's quarterly reports, press releases and presentations to securities analysts,

money and portfolio managers and institutional investors, *i.e.*, the market. Each Individual Defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of these Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations which were being made were then materially false and misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group published" information, the result of the collective actions of the Individual Defendants and should also be deemed "control persons" of the Company.

## IV.   SUBSTANTIVE ALLEGATIONS

### A.   CHANGING INCENTIVES IN THE MORTGAGE INDUSTRY IMPACT THE RELATIONSHIPS AMONG INDUSTRY PARTICIPANTS

19.    In recent years, as a result of changes in the way mortgage loans are held by financial institutions, incentives among participants in the mortgage industry have changed dramatically. Banks that originate mortgages, such as Washington Mutual, no longer have an incentive to ensure that home loans are predicated upon fair and accurate appraisals. This occurs because the majority of loans are pooled together, securitized, and sold to investors as mortgage backed securities, rather than being held by the originating entity. The money that the lender receives for the sale of the mortgage loans or bonds is then used to finance new mortgages, increasing the lender's profits and aiding its stock price. The vast majority of mortgage loans are sold to investment banks or other investors, leaving the original lender holding far fewer mortgages in its portfolio.

20.     This reconfiguration of the way that mortgages are held has transformed the incentives in the industry. Specifically, it has the effect of making the lender less vigilant against risky loans since any risk is quickly transferred to the purchasers of the loans. Moreover, as the lender does not hold many of its loans in its portfolio, the lender's interest in ensuring the accuracy of the appraisal backing the loan is severely diminished. Even worse, because lenders' profits are determined by the quantity of loans they successfully close, and not the quality of those loans, there is an incentive for a lender to pressure appraisers to reach values that will allow the loan to close, whether or not the appraisal accurately reflects the home value.

**B.     THE ROLE OF THE APPRAISER**

21.     The independence and integrity of the real estate appraisers who determine the value of home loan collateral is of enormous importance.  Real estate appraisals are intended to provide borrowers and lenders with an independent and accurate assessment of the value of a home.  This ensures that a mortgage or home equity loan is not under-collateralized, which in turn protects borrowers from being over-extended financially and lenders and investors from loss of value in a foreclosure proceeding.

22.     First American has recognized and in the past has touted the central role it plays, through its appraisal management company, eAppraiseIT, in protecting homeowners, business customers, and the entire financial market.  As the Company explains in its 2006 Annual Report:

> Appraisals are used to establish a property's market value; therefore, inaccurate or fraudulent appraisals damage the entire market and have negative economic effects that are far reaching.  First American's third-party, unbiased valuations - including insured valuations - are a resource real estate and lending professionals can turn to for accuracy that benefits not only the homeowner and lender, but our nation's economy.

*Value to Consumers*: Homeowners, who place a large investment in their property, can be particularly victimized by appraisal fraud. First American's warranted valuations, which are supported by our third party perspective and backed by more than a century of integrity, virtually eliminate risk from this type of fraud.

*Value to our Business Customers*: Inaccurately appraised properties that make their way into lender portfolios increase the opportunity for foreclosures. Our national services provide our mortgage lender customers with a welcomed resource for unbiased appraisals that satisfy increased regulatory concerns, help to accurately determine value, and mitigate default risk.

23.     Because of the importance of honest appraisal to the integrity of the mortgage origination process, the law requires that appraisals be accurate and independent.  The Uniform Standards of Professional Appraisal Practice ("USPAP") are incorporated into federal and New York law. See 12 C.F.R. § 34.44; 19 NYCRR § 1106.1.  The USPAP requires independence: "An appraiser must perform assignments with impartiality, objectivity, and independence, and without accommodation of personal interests.  In appraisal practice, an appraiser must not perform as an advocate for any party or issue." USPAP Ethics Rule (Conduct).  Federal law sets independence standards for appraisers involved in federally regulated transactions. See 12 U.S.C. § § 3331, et seq. Specifically, applicable state and federal laws and regulations preclude appraisers from responding to lenders who seek to exert influence over the appraisal process or appraisal value.

### C.     FIRST AMERICAN GROWS ITS APPRAISAL BUSINESS

24.     In the Spring of 2006, WaMu retained eAppraiseIT after WaMu decided to close its internal appraisal office and terminate its staff appraisers.  WaMu quickly became eAppraiseIT's largest client, providing nearly 30 percent of its business in New

York.  Over the course of the business relationship, eAppraiseIT conducted more than 260,000 appraisals for WaMu throughout the United States, receiving over $50 million.

25.    Beginning in mid-2006, First American was already touting the large increases derived from its appraisal business.  For example, in its July 26, 2006 earnings report for the second quarter ended June 30, 2006, First American reported second quarter revenues of $2.17 billion, setting an all-time high for second quarter revenues.  In regards to its information technology segment, the Company attributed a significant basis for its increased operating revenues to increased appraisal revenues resulting from market share growth.

26.    Later in the Class Period, on May 3, 2007, First American announced financial results for the first quarter of 2007.  Again, the Company highlighted its appraisal business as a bright spot, stating "the Property Information segment grew its operating revenues 47 percent and pretax profits 50 percent, compared with the first quarter of 2006.  The Property Information segment's operating revenues were positively affected by an increase in its appraisal business, which grew by more than 100 percent."

**D.    FIRST AMERICAN, THROUGH ITS EAPPRAISEIT SUBSIDIARY, BOWED TO PRESSURE FROM WASHINGTON MUTUAL TO IMPROPERLY MANIPULATE AND OBTAIN INFLATED APPRAISALS**

**1.    First American Becomes Ensnared In An Investigation Into The Issues Of Appraisal Inflation**

27.    On May 22, 2007, New York Attorney General Andrew Cuomo issued a subpoena to the real estate appraisal unit of First American as part of his investigation of whether mortgage brokers pressured appraisers to inflate property values.

28.    A *Bloomberg* article reported that First American's eAppraiseIT LLC, which values up to 15,000 homes a year in New York, was asked for information about

appraisals performed throughout the state.  *Bloomberg* quoted Anthony Merlo Jr., eAppraiseIT's President, stating in an interview that "It's a very good thing, what the attorney general is doing, Cuomo's office was focused on who's exerting the pressure on appraisers."  According to the article, appraisers have increasingly felt pressure to inflate appraisals.  In a study last year by Richfield, Ohio-based October Research Corp., 90 percent of appraisers said they felt influenced to write bogus appraisals. Four years ago, that number was 55 percent.  Seventy-one percent said mortgage brokers asked them to do it.  The article had also pointed out that Cuomo had recently issued subpoenas to appraiser Mitchell, Maxwell & Jackson Inc. and broker Manhattan Mortgage Co., as well.

29.     Industry pressures continued to mount when on June 7, 2007, Ohio Attorney General Marc Dann sued seven real estate companies he said improperly pressured appraisers to inflate home values in the state, which has the country's third highest number of foreclosures.  Those sued include four mortgage brokers, two lenders and an appraiser.

30.     The increased scrutiny on the industry finally began to takes its toll on First American's stock price.  On June 7, 2007, First American's stock price declined $1.61 per share from $54.81 per share June 6, 2007 to $53.20 per share.   The next day the stock declined an additional $2.00 per share for a 2-day total decline of 7 percent, after Cuomo subpoenaed another appraisal firm called Vanderbilt.

31.     On July 17, 2007, Mitchell, Maxwell & Jackson Inc., the other real estate appraiser that had publicly acknowledged receiving a subpoena in the New York state mortgage industry probe, announced that it had agreed to revise its appraisal rules stating

it would not provide preliminary values on homes it hasn't seen or allow customers to include their own estimates on orders.  According to a Bloomberg article, the company was revising its practices as New York Attorney General Andrew Cuomo, Ohio Attorney General Marc Dann and three other states investigate the mortgage industry, focusing in part on pressure applied to appraisers to inflate home values.

32.     In reaction to the news, First American's stock dropped $1.06 per share or 2 percent on July 17, 2007 from $49.91 per share on July 16, 2007 to $48.85 per share. The Company's stock price continued to decline over the next few months as equities related to the housing and mortgage market were dropping in sympathy with negative news related to the real estate market.  Investors were increasingly becoming aware that First American's multiple business lines, including its appraisal services, would be in less demand as the housing market continued to slow and investors began to realize that appraisers may have played a key role in the housing bubble and subsequent sub-prime crisis.

### 2.     First American's Fraudulent Appraisal Practices Are Revealed

33.     On November 1, 2007, the New York Attorney General's Office filed a complaint against First American, revealing an illegal appraisal inflation scheme with WaMu.  The complaint revealed that WaMu and eAppraiseIT orchestrated a scheme to manipulate the value of appraisals to close more loans so that WaMu could increase the volume and value of the loans it was planning to sell as securitized loans.  According to the Attorney General's Office, WaMu was not named as a defendant in the action because the New York Attorney General's Office is preempted from bringing such action against WaMu, a federally chartered bank.

34.     In relevant part, the New York Attorney General's November 1, 2007 press release announcing the suit states:

> In a scheme detailed in numerous e-mails, …[eAppraiseIT] caved to pressure from…[WaMu] to use a list of preferred "Proven Appraisers" who provided inflated appraisals on homes. **The e-mails also show that executives at eAppraiseIT knew their behavior was illegal, but intentionally broke the law to secure future business with WaMu.**
>
> 'The independence of the appraiser is essential to maintaining the integrity of the mortgage industry. First American and [eAppraiseIT] violated that independence when [WaMu] strong-armed them into a system designed to rip off homeowners and investors alike,' said Attorney General Cuomo. 'The blatant actions of First American and [eAppraiseIT] have contributed to the growing foreclosure crisis and turmoil in the housing market. By allowing [WaMu] to hand-pick appraisers who inflated values, First American helped set the current mortgage crisis in motion.'
>
> *               *               *
>
> In April 2006, eAppraiseIT began providing appraisal services for WaMu, which became eAppraiseIT's biggest client. Within weeks, WaMu began complaining to eAppraiseIT that its appraisals were not high enough. WaMu pressured eAppraiseIT to employ exclusively a new panel of appraisers that WaMu hand-selected as "Proven Appraisers." This set of appraisers was chosen by WaMu specifically because they inflated property appraisals. WaMu profited from these higher appraisals because they could close more home loans, at greater values. Over the course of their relationship, between April 2006 and October 2007, eAppraiseIT provided approximately 262,000 appraisals for WaMu.

### 3.     The Fraudulent Scheme At First American

35.     By April 2006, the beginning of the Class Period, senior executives at First American and WaMu had entered into a scheme to manipulate the value of appraisals provided by eAppraiseIT. During the Class Period, First American actively participated in that illegal scheme. The executives' motivation was to increase profits, the company's stock price, and their personal wealth. The Attorney General's investigation unearthed a series of e-mails involving senior WaMu, First American and eAppraiseIT executives that strongly suggest that they collectively conspired to violate

federal and state independence rules and regulations and fraudulently inflate appraisal
values.  Some of these e-mails were described in the Attorney General's press release and
include the following:

- On February 22, 2007, in response to a description of the
  WaMu "Proven Appraiser" program as one in which "we
  will now assign all Wamu's work to Wamu's 'Proven
  Appraisers'… [and] Performance ratings to retain position
  as a Wamu Proven Appraiser will be based on how many
  come in on value," [eAppraiseIT's] president told senior
  executives at First American: "**we have agreed to roll over
  and just do it...**"

- On April 4, 2007, [eAppraiseIT]'s executive vice president
  stated in an e-mail to First American: "we as an AMC
  [Appraisal Management Company] need to retain our
  independence from the lender or it will look like
  collusion… [eAppraiseIT]'s clearly being directed who to
  select.  The reasoning… is bogus for many reasons
  including the most obvious – the proven appraisers bring in
  the values."

- On April 17, 2007, [eAppraiseIT]'s president wrote an e-
  mail to First American explaining why its conduct was
  illegal: "We view this as a violation of the OCC, OTS,
  FDIC and USPAP influencing regulation."

(Emphasis in original)  E-mail evidence also shows that WaMu pressured eAppraiseIT to
inflate appraisals as a condition for doing future business together:

- On September 27, 2006, First American's vice chairman
  reported that a WaMu executive told him: "if the appraisal
  issues are resolved and things are working well he would
  welcome     conversations    about    expanding    our
  relationship…"

36.     Other e-mails also reflect eAppraiseIT's illegal activities.  For example, a
September 29, 2006, e-mail from an unidentified WaMu executive to eAppraiseIT senior
executives, described how WaMu could challenge an appraiser's conclusions.  The

process was called a request for a "reconsideration of value" ("ROV"), and was used

when WaMu disagreed with an appraised home value in an appraisal report:

> …the four appraisers/reviewers would be directly involved
> in escalations dealing with:  ROVs, Valuation issues where
> the purchase price and appraised value differ with no
> reconciliations/justifications by the appraiser, Value cuts
> which we continue to receive from your third reviewers
> (Wholesale), **proactively making a decision to override
> and correct the third party appraiser's value or
> reviewer's value cut**, when considered appropriate and
> supported…

(Emphasis added)  Almost from the outset of the Class Period, therefore, WaMu sought

to use eAppraiseIT to ensure that appraisals did not come in lower than WaMu desired.

        37.    Washington Mutual also applied more direct pressure to First American,

as indicated by the following e-mail, dated April 17, 2007, from an appraiser to

eAppraiseIT:

> This is the second WaMu Appraisal quality assurance issue
> I have received from WaMu in the past two months.  Both
> as a result of an appraisal I completed that did not come in
> to their predetermined value for a "valued" WaMu client.  **I
> was pressured for 2 weeks to change both my value and
> the conditions of my appraisal report…both of which
> were violations of USPAP, FANNIE MAE and the
> Supplemental Standards I am required to observe and
> am bound by license to complete.  Since that time, I
> have been singled out by WaMu and have been
> pressured on every appraisal I have completed that did
> not reach a pre-determined value**.  I feel that WaMu is in
> process of "blacklisting" me as an approved WaMu
> appraiser by going after each appraisal I complete and
> looking for violations.

(Emphasis added)

        38.    The evidence unearthed by the Attorney General demonstrates that the

participants in the scheme knew their actions were illegal.  For example, eAppraiseIT's

President wrote to senior executives at First American, describing issues with Washington Mutual, as follows:

> In short, the issues are using their designated appraisers as mandated by the WaMu production force at 20% gross margin and bypassing our panel. **We view this as a violation of the OCC, OTS, FDIC and USPAP influencing regulation.**

(Emphasis added)

39.     These e-mails and other evidence demonstrate that Defendants made numerous false and misleading statements during the Class Period.

## V.     FALSE AND MISLEADING STATEMENTS AND MATERIAL OMISSIONS MADE DURING THE CLASS PERIOD

40.     First American's statements and disclosures were false and misleading because the Company failed to disclose that it was intentionally inflating appraisals and violating federal and state appraisal independence laws in the process.  As explained in its 2006 Annual Report, First American recognized and touted the central role it played, through its appraisal management company eAppraiseIT, in protecting homeowners, business customers, and the entire financial market.  As we now know, however, senior executives at First American were directly participating in these fraudulent practices.

41.     First American's practice of inducing appraisers to overvalue real property on Washington Mutual's loans was an artificial shell game, and it was obviously unsustainable.  The business model on which First American built its revenue stream for real estate appraisals would, sooner or later, run out of unwitting consumers and then business revenues at First American would decrease substantially.

42.     On July 26, 2006, after the close of the financial markets, First American issued a press release to report its financial results for the second quarter of 2006, which

stated that second quarter revenues were $2.17 billion, net income was $114.7 million, and net income per diluted share was $1.16.

43.    On January 8, 2007, First American filed its quarterly report on Form 10-Q with the SEC, which substantially incorporated the financial results released on July 19, 2006, and disclosed that the Company's revenue from the property information segment, including real estate appraisals, was $144.6 million.

44.    The January 8, 2007, Form 10-Q included Defendants Kennedy's and McMahon's certifications under Section 302 of Sarbanes-Oxley Act.

45.    The January 8, 2007, Form 10-Q also contained certifications by Defendants Kennedy and McMahon pursuant to Section 906 of the Sarbanes-Oxley Act which stated in pertinent part that each certified "that this report on Form 10-Q fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 and that the information contained in this report fairly presents, in all material respects, the financial condition and results of operations of First American Corporation"

46.    Defendants' July 26, 2006, and January 8, 2007, disclosures, referenced above, were materially false and misleading because:

> a.    Defendants failed to disclose their intentional violations of the USPAP standards as codified under Federal and state      laws;
>
> b.    The Company's reported income was materially misstated      as a result of fees derived from inflated appraisals given for   Washington Mutual loans;
>
> c.    Defendants   Kennedy's   and   McMahon's certifications under   Sections   302   and   906   of   the Sarbanes-Oxley Act were false      in   light   of   the intentional   manipulation   of   appraisal   values,      financial misstatements, and substantive false statements      and omission of material information.

47.     On November 2, 2006, after, the close of the financial markets, First American issued a press release to report its financial results for the third quarter of 2006, which stated as follows in relevant part:  Third quarter revenues were $2.17 billion, net income was $98 million, and net income per diluted share was $1.00.  The earnings report stated:  "Operating revenues for the Property Information segment increased $19.6 million, or 14.2 percent, and $52.5 million, or 13.7 percent, for the three and nine months ended Sept. 30, 2006, respectively, when compared with the same periods of the prior year. These increases were primarily due to the continued strength in this segment's subscription-based information businesses, increased appraisal revenues resulting from market share growth…."

48.     On January 8, 2007, First American filed its quarterly report on Form 10-Q with the SEC, which substantially incorporated the financial results released on November 2,

2006, and disclosed that the Company's revenue from real estate appraisals was $157 million.

49.     The January 8, 2007, Form 10-Q included Defendants Kennedy's and McMahon's certifications under Sections 302 and 906 of the Sarbanes-Oxley Act, which were identical in all material respects to those certifications filed by Kennedy and McMahon with the January 8, 2007, Form 10-Q filed for the second quarter 2006.

50.     Defendants' November 2, 2006, and January 8, 2007, disclosures, referenced above, were materially false and misleading because:

        a.   Defendants failed to disclose their intentional violations of the USPAP standards as codified under Federal and state laws;

        b.   The Company's reported income was materially misstated as a result of fees for inflated appraisals;

      c.  Defendants Kennedy and McMahon's certifications under Sections 302 and 906 of the Sarbanes-Oxley Act were false in light of the intentional manipulation of appraisal values, financial misstatements, and substantive false statements and omission of material information.

51.    On March 1, 2007, after the close of the financial markets, First American issued a press release to report its financial results for the fourth quarter of and full year 2006, which stated as follows in relevant part:  "For the year ended Dec. 31, 2006, revenues grew to $8.5 billion, up 5 percent from $8.1 billion in the year ended Dec. 31, 2005.  Net income was $287.7 million for the full year 2006, versus $480.4 million for 2005.  Diluted earnings per share were $2.92 in the year ended Dec. 31, 2006, compared with $4.92 in the prior year."  The appraisal section continued to perform well, increasing revenues, as follows:  "During the fourth quarter of 2006, the Property Information segment grew its revenues 27 percent, versus the fourth quarter of 2005, to $170.2 million."

52.    The 2006 Form 10-K provided the following disclosure concerning the Company's internal controls, which stated that the Company's  "management determined that, as of December 31, 2006, the Company's internal control over financial reporting was effective."

53.    The 2006 Form 10-K included Defendants Kennedy's and McMahon's certifications under Sections 302 and 906 of the Sarbanes-Oxley Act, which were identical in all material respects to those certifications filed by Kennedy and McMahon with the January 8, 2007, Form 10-Q.

54.    The 2006 10-K also incorporated the Company's Code of Ethics and Code of Conduct by reference, which it noted were available on First American's website. As of November 6, 2007, the Company's Code of Ethics and Conduct stated as follows:

**D. Fair Dealing** – As an employee, officer or director you must endeavor to deal fairly and in good faith with Company customers, suppliers, competitors and employees. You should not take unfair advantage of anyone through manipulation, concealment, abuse of privileged or confidential information, misrepresentation of material facts, or any other unfair dealing practice.

**G. Fraud** - As an employee, officer or director you should not engage in fraudulent conduct. Fraud is defined as deliberately practiced deception, whether by words, conduct, false or misleading allegations, or by concealment, to secure unfair or unlawful gain. Fraud covers both express and implied representations of fact, and may be written or oral.

55. The March 1, 2007, earnings report and Annual Report statements referenced above were materially false and misleading because:

    a. Defendants failed to disclose their intentional violations of the USPAP standards as codified under Federal and state laws;

    b. The Company's reported revenues were materially misstated as a result of fees earned from inflated appraisals;

    c. The Company's substantive disclosures concerning the adequacy of its internal controls were materially false and misleading in light of the intentional inflation of appraisals by Company executives;

    d. The Company failed to disclose that its Code of Ethics and Code of Conduct were being knowingly violated through the intentional manipulation of the appraisal process, in violation of legal and ethical standards; and

    e. Defendants Kennedy's and McMahon's certifications under Sections 302 and 906 of the Sarbanes-Oxley Act were false in light of the intentional manipulation of appraisal values, financial misstatements, and substantive false statements and omission of material information.

## VI. THE DROP IN FIRST AMERICAN'S STOCK PRICE WAS PROXIMATELY CAUSED BY DISCLOSURE OF THE SCHEME TO ISSUED INFLATED APPRAISALS

56. Despite a weakening housing market, First American's stock price climbed fairly significantly from the end of 2006 through the first half of 2007 trading as

high as $55.25 per share on June, 1, 2007, as the Company and the Individual Defendants kept hidden the scheme to inflate appraisals.

57.     On May 22, 2007, the New York Attorney General issued a subpoena to the real estate appraisal unit of First American in the investigation of whether mortgage brokers pressured appraisers to inflate property values.

58.     A *Bloomberg* article reported that First American's eAppraiseIT, which values up to 15,000 homes a year in New York, was asked for information about appraisals performed throughout the state.  *Bloomberg* quoted Anthony Merlo, Jr., eAppraiseIT's President, stating in an interview that: "It's a very good thing, what the attorney general is doing, Cuomo's office was focused on who's exerting the pressure on appraisers."  According to the article, appraisers have increasingly felt pressure to inflate appraisals.  In a study last year by Richfield, Ohio-based October Research Corp., 90 percent of appraisers said they felt influenced to write bogus appraisals. Four years ago, that number was 55 percent.  Seventy-one percent said mortgage brokers asked them to do it.  The article had also pointed out that Cuomo had recently issued subpoenas to appraiser Mitchell, Maxwell & Jackson, Inc., and broker Manhattan Mortgage Co., as well.

59.     Industry pressures continued to mount when on June 7, 2007, Ohio Attorney General, Marc Dann, sued seven real estate companies he said improperly pressured appraisers to inflate home values in the state, which has the country's third highest number of foreclosures.  Those sued include four mortgage brokers, two lenders and an appraiser.

60.     The increased scrutiny on the industry began to take its toll on First American's stock price.  On June 7, 2007, First American's stock price declined $1.61 per share from $54.81 per share June 6, 2007 to $53.20 per share.  The next day the stock declined an additional $2.00 per share for a 2-day total decline of 7 percent, after New York Attorney General, Andrew Cuomo, subpoenaed another appraisal firm called Vanderbilt.

61.     On July 17, 2007, Mitchell, Maxwell & Jackson Inc., the other real estate appraiser that had publicly acknowledged receiving a subpoena in the New York state mortgage industry probe, announced that it had agreed to revise its appraisal rules stating it would not provide preliminary values on homes it hasn't seen or allow customers to include their own estimates on orders.  According to a *Bloomberg* article, the company was revising its practices as New York, Ohio and three other states investigate the mortgage industry, focusing in part on pressure applied to appraisers to inflate home values.

62.     In reaction to the news, First American's stock dropped $1.06 per share or 2 percent on July 17, 2007 from $49.91 per share on July 16, 2007 to $48.85 per share. The Company's stock price continued to decline over the next few months as equities related to the housing and mortgage market were dropping in sympathy with negative news related to the real estate market.  Investors were increasingly becoming aware that First American's multiple business lines, including its appraisal services, would be in less demand as the housing market continued to slow and investors began to realize that appraisers may have played a key role in the housing bubble and subsequent sub-prime crisis.

63.     On November 7, 2007, New York Attorney General widened his probe even more when he issued subpoenas to Fannie Mae and Freddie Mac expanding his investigation into "widespread" collusion between real estate appraisers and lenders.  In response, First American's stock price dropped $2.00 per share from $32.07 per share on November 6 to $30.07 on November 7, representing a 6 percent drop on heavy volume of over 4 million shares traded, compared to average daily volume of about 1 million shares.

64.     As investigations by multiple states into inflated appraisals continued, and the negative news regarding sub-prime mortgages and securitized products mounted, First American's stock price continued its freefall and was trading at about $30 per share at the end of October 2007, over 45% lower than its high of $55.25 per share on June 1, 2007.

65.     After the November 1, 2007 filing of the New York Attorney General's lawsuit, First American's stock price dropped from an October 31, 2007 close of $30.10 per share to an intra-day low of $28.69 per share on November 1, 2007 representing a 5% decline and a new 52-week low for the stock.

66.     After the November 7, 2007 news of an expanded probe into inflated home appraisals by Cuomo, where he stated he found a "pattern of collusion" on mortgage appraisals linked to Washington Mutual, First American's stock price dropped $2.00 per share from $32.07 per share on November 6 to $30.07 on November 7, representing a 6 percent drop on heavy volume of over 4 million shares traded, compared to average daily volume of about 1 million shares.

67.     Overall, from its June 2007 high to its closing price on November 7, First American's stock price declined from $55.11 per share to $30.07 per share, declining 45

percent and wiping out approximately $2.3 billion in market capitalization.   The Company's stock price drop in this period was proximately caused by the disclosure to the market of First American's practice of falsely inflating appraisals.

## VII.   CLASS ACTION ALLEGATIONS

68.   Plaintiff brings this action as a Class Action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a Class consisting of all purchasers of the publicly traded securities of First American Corporation between April 26, 2006, and November 6, 2007.   Excluded from the Class are defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

69.   At all relevant times, the market for First American securities was an efficient market for the following reasons, among others:

1.   First American securities met the requirements for listing, and were listed, on the New York Stock Exchange ("NYSE"), an efficient and automated market;

2.   During the Class Period, millions of shares of First American securities were traded on the open market;

3.   As a regulated issuer, First American filed periodic public reports with the SEC and the NYSE; and

4.   First American was followed by numerous securities analysts employed by brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms.   These reports were publicly available and entered the public marketplace.

70.   As a result, the market for First American securities promptly digested current information regarding the Company from all publicly available sources and reflected such information in First American's Share price. Under these circumstances,

all purchasers of the Company's common shares during the Class Period suffered similar injury through their purchase of shares at artificially inflated prices and a presumption of reliance applies.

71.     This action is properly maintainable as a class action because:

1.      The members of the Class are so numerous and geographically diverse that joinder of all of them is impracticable. Throughout the Class Period, First American securities were actively traded on the NYSE.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class;

2.      Plaintiff's claims are typical of the claims of the other members of the Class, as Plaintiff and the members of the Class purchased First American shares and sustained damages as a result of the defendants' wrongful conduct complained of herein;

3.      Plaintiff is a representative party who will fairly and adequately protect the interests of the other members of the Class and has retained counsel competent and experienced in class action securities litigation.  Plaintiff has no interests antagonistic to, or in conflict with, the Class it seeks to represent;

4.      A class action is superior to other available methods for the fair and efficient adjudication of the claims asserted herein. As the damages suffered by the individual Class members maybe relatively small, the expense and burden of individual litigation make it virtually impossible for the Class members individually to redress the wrongs done to them. The likelihood of individual Class members prosecuting separate claims is remote;

5.      The questions of law and fact common to the members of the Class predominate over any questions affecting individual members of the Class. The questions of law and fact which are common to Plaintiff and the Class include, among others:

a.      whether the federal securities laws were violated by defendants' acts as alleged herein;

b.      whether statements disseminated to the investing public and to First American's shareholders during the Class Period misrepresented material facts about the operating results and financial condition of the Company;

c.      whether defendants acted with knowledge or with reckless disregard for the truth in misrepresenting and/or omitting to state material facts;

d.      whether, during the Class Period, the market price of First American securities was artificially inflated due to the material misrepresentations and/or nondisclosures complained of herein;

e.      whether the defendants participated in and pursued the common course of conduct complained of herein; and

f.      whether the members of the Class have sustained damages and, if so, what is the proper measure thereof.

72.     Plaintiff anticipates no unusual difficulties in the management of this action as a class action.

## VIII.   NO SAFE HARBOR/ADDITIONAL SCIENTER ALLEGATIONS

73.     As alleged herein, the Defendants acted with *scienter* because at the time that they issued public documents and other statements in First American's name, they knew or recklessly disregarded the fact that such statements were materially false and misleading, or omitted to disclose material facts.  Moreover, the Defendants knew such documents and statements would be issued or disseminated to the investing public, knew that persons were likely to rely upon those misrepresentations and omissions, and knowingly and recklessly participated in the issuance and dissemination of such statements and documents as primary violators of the federal securities laws.

74.     As set forth in detail throughout the Complaint, the Defendants, by virtue of their control over, and/or receipt of First American's materially misleading statements, and their positions with the Company which made them privy to confidential proprietary information concerning First American's improper appraisal practices, and used such information to artificially inflate First American's financial results.  The Defendants

created, were informed of, participated in, and knew of, the scheme alleged herein to distort and suppress material information pertaining First American's improper manipulation of appraisals. With respect to non-forward looking statements and omissions, the Defendants knew and recklessly disregarded the falsity and misleading nature of that information, which they caused to be disseminated to the investing public. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the false statements pleaded in this Complaint. None of the statements pleaded herein are "forward-looking" statements and no such statement was identified as a "forward-looking statement" when made. Rather, the statements alleged herein to be false and misleading by affirmative misstatement and/or omissions of material fact all relate to facts and conditions existing at the time the statements were made. Moreover, cautionary statements, if any, did not identify important factors that could cause actual results to differ materially from those in any putative forward-looking statements.

75.     In the alternative, to the extent that the statutory safe harbor does apply to any statement pleaded herein which is deemed to be forward-looking, the Defendants are liable for such false forward-looking statements because at the time each such statement was made, the speaker actually knew and/or recklessly disregarded the fact that such forward-looking statements were materially false or misleading and/or omitted facts necessary to make statements previously made not materially false and misleading, and/or that each such statement was authorized and/or approved by a director and/or executive officer of First American who actually knew or recklessly disregarded the fact that each such statement was false and/or misleading when made.  None of the historic or

present tense statements made by the Defendants was an assumption underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such an assumption underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by the Defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

76.     Substantial sales of First American stock by insiders during the Class Period demonstrates that they believed that the stock price would drop when the illegal scheme was revealed.  For example, on March 2, 2007, executive vice president, Gary Lewis Kermott, sold 30,000 shares of First American at $47.60-$47.83 per share, for total proceeds of $1.4 million.  During the same week, March 2-7, 2007, five additional officers and directors sold shares (Curt. G. Johnson, Anand K. Nallathambi, Martin R. Wool, William G. Davis, and John W. Long), totaling nearly $4 million.  Between March and November 2007, as the insiders saw that investigation proceed into their inflated appraisal scheme, officers and directors of First American sold 196,531 shares for net proceeds of $9,212,438.  During the same period, only three insiders made purchases totaling 11,988 shares, or one-tenth the amount of the shares sold by insiders.

IX.     COUNTS

## COUNT I

**AGAINST ALL DEFENDANTS FOR VIOLATION OF SECTION 10(b) OF THE SECURITIES EXCHANGE ACT AND RULE 10b-5 THEREUNDER**

77.     Plaintiff repeats and realleges each and every allegation above, as if set forth in full herein.

78.     Throughout the Class Period, Defendants, individually and in concert, directly or indirectly, engaged in a common plan, scheme and course of conduct described herein, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and a course of business which operated as a fraud upon Plaintiff and the other members of the Class; made various false statements of material facts and omitted to state material facts to make the statements made not misleading to Plaintiff and the other members of the Class; and employed manipulative or deceptive devices and contrivances in connection with the purchase and sale of First American securities.

79.     The purpose and effect of Defendants' plan, scheme and course of conduct were to artificially inflate the price of First American's securities and to artificially maintain the market price of First American securities.

80.     The Individual Defendants, who were the top officers of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other First American personnel to members of the investing public, including Plaintiff and the Class, and the securities analysts.

81.     As a result of the foregoing, the market price of First American securities was artificially inflated during the Class Period. In ignorance of the falsity of the Defendants' statements concerning the operating results and performance of First American, Plaintiff and the other members of the Class relied, to their damage, on the statements described above and/or the integrity of the market price of First American

securities during the Class Period in purchasing First American securities at prices which were artificially inflated as a result of defendants' false and misleading statements.

82.   Had Plaintiff and the other members of the Class known of the material adverse information which Defendants did not disclose, they would not have purchased First American securities at the artificially inflated prices that they did.

83.   Defendants' concealment of this material information served only to harm Plaintiff and the other members of the Class who purchased First American securities in ignorance of the financial risk to them as a result of such nondisclosures.

84.   As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

85.   As alleged herein, Defendants acted with *scienter* in that Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding First American, their control over, and/or receipt and/or modification of First American's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning First American, participated in the fraudulent scheme alleged herein.

86.   The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in

this Complaint.  The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.  In addition, to the extent certain of the statements alleged to be false may be characterized as forward-looking, they were not identified as "forward-looking statements" when made, there was no statement made with respect to any of those representations forming the basis of this Complaint that actual results "could differ materially from those projected," and there were no meaningful cautionary statements identifying relevant important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward looking statements was made, the Defendants had actual knowledge that the particular forward looking statement was false.

87.    The statutory safe harbor provided for forward-looking statements under certain circumstances, moreover, does not apply to false statements or material omissions of existing facts.

88.    By reason of the foregoing, defendants have violated Section 10(b) of the Exchange Act and Rule l0b-5 promulgated thereunder, and are liable to the Plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchase of First American securities during the Class Period.

**COUNT II**
**AGAINST THE INDIVIDUAL DEFENDANTS UNDER SECTION 20(A) FOR**
**VIOLATIONS OF THE SECURITIES EXCHANGE ACT**

89.    Plaintiff repeats and realleges each and every allegation above, as if set forth in full herein.

90.     During the Class Period, each of the Individual Defendants, by virtue their offices at, and directorship of First American and their specific acts, was a controlling person of First American within the meaning of Section 20(a) of the Exchange Act.

91.     Each Individual Defendant 's positions made him privy to, and provided him with actual knowledge of, the material facts which the Individual Defendants and First American concealed from Plaintiff and the other members of the Class during the Class Period.

92.     Each of the Individual Defendants had the power and influence, and exercised same, to engage in the unlawful conduct and practices complained of herein by causing First American to disseminate the false and misleading information referred to above.

93.     By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

94.     By virtue of the conduct alleged above, the Individual Defendants are liable to the Plaintiff and the other members of the Class for the substantial damages that they suffered in connection with their purchases of First American's securities during the Class Period.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for relief and judgment on behalf of itself and other members of the Class, as follows:

A.     Awarding compensatory damages in favor of Plaintiff and the other members of the Class against all Defendants for all damages sustained as a result of

Defendants' wrongdoing, in an amount to be proven at trial, including pre- and post-judgment interest thereon;

B.      Certifying Plaintiff as the Class Representative and his counsel as Class Counsel;

C.      Declaring and determining that defendants violated the federal securities laws by reason of their conduct as alleged herein;

D.      Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

E.      Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

F.      Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: June 23, 2008                    Respectfully submitted,

                                        **GRANT & EISENHOFER P.A.**


                                        Jay W. Eisenhofer (JE-5503)
                                        Stuart M. Grant (SG-8157)
                                        485 Lexington Avenue, 29th Floor
                                        New York, NY 10017
                                        Telephone: (646) 722-8500
                                        Facsimile: (646) 722-8501


                                            and


                                        Geoffrey C. Jarvis (GJ-7040)
                                        1201 North Market Street
                                        Wilmington, DE 19801
                                        Telephone: (302) 622-7000
                                        Facsimile: (302) 622-7100


                                        Counsel for Plaintiff

# EXHIBIT A

## CERTIFICATION OF
## BERKS COUNTY EMPLOYEES' RETIREMENT FUND
## IN SUPPORT OF MOTION FOR APPOINTMENT
## AS LEAD PLAINTIFF AND FOR APPROVAL
## OF ITS SELECTION OF COUNSEL

The undersigned, Christian Leinbach, makes this Certification pursuant to 28 U.S.C. 1746 and 15 U.S.C. 78u-4, and states as follows:

1.      I am the County Commissioner for Berks County, Pennsylvania, and the Chairman of the Board of the Berks County Employees' Retirement Fund, and am authorized to make this Certification on behalf of the Berks County Employees' Retirement Fund ("BCERF").

2.      I have reviewed the Complaint filed by BCERF against First American Corporation ("First American") and others, and have authorized its filing.

3.      I have reviewed the records of BCERF's transactions in the securities of First American for the class period ("Class Period"). Those transactions are listed in the chart attached as Schedule A to this Certification.

4.      BCERF intends to actively monitor and vigorously pursue this action for the benefit of the class, rather than simply rely on its attorneys. BCERF has retained the law firm of Grant & Eisenhofer P.A. to represent it. This firm is knowledgeable and experienced in securities law and litigation, particularly with regard to the role and responsibilities of institutional investors in class actions.

5.      Like other investors who purchased First American securities during the Class Period, BCERF believes its losses occurred as a result of the defendants' fraudulent conduct and violations of the securities laws. BCERF believes that its claims against the defendants are typical of those of other members of the class.

6.    BCERF did not purchase the securities that are the subject of the various complaints at the direction of counsel or to participate in any private action arising under the federal securities laws. BCERF invested in First American solely for its own business purposes.

7.    BCERF is willing to serve as the representative party on behalf of the class of First American security holders who invested during the Class Period. BCERF intends to pursue this litigation for the best interests of the class members and take whatever steps are necessary regardless of geographic location.

8.    During the three-year period preceding the date of this Certification, BCERF has not served or sought to serve as a representative party for a class in an action under the federal securities laws.

9.    BCERF will not accept any payment for serving as representative party on behalf of the class beyond its *pro rata* share of any recovery, except as ordered and approved by this Court.

I declare under the penalty of perjury under the laws of the United States that the foregoing is true and correct.

Dated: June 1 7, 2008

Honorable Christian Leinbach
Berks County Commissioner and
Chairman of the Board
Berks County Employees' Retirement Fund



**First American Corporation**
**Class Period:  April 27, 2006 through November 6, 2007**
**Berks County Employees' Retirement Fund**

| ----------------------Purchases---------------------- | | | | ----------------------------Sales---------------------------- | | |
|---|---|---|---|---|---|---|
| Trade Date | Shares | Price | | Trade Date | Shares | Price |
| Open position | 15,050 | | | | | |
| | | | | | | |
| 10/27/06 | 50 | $41.8840 | | 12/13/06 | 20,050 | $40.8517 |
| 10/30/06 | 450 | $41.4072 | | 3/14/07 | 3,650 | $51.1100 |
| 10/31/06 | 300 | $40.9395 | | 3/14/07 | 1,875 | $51.1500 |
| 11/1/06 | 650 | $40.7145 | | 3/28/07 | 100 | $51.2727 |
| 11/2/06 | 3,500 | $38.5303 | | 4/3/07 | 550 | $51.0372 |
| 11/3/06 | 2,300 | $37.9108 | | 4/4/07 | 450 | $51.5156 |
| 11/6/06 | 750 | $37.8038 | | 7/25/07 | 1,000 | $47.6494 |
| 11/7/06 | 750 | $37.5725 | | 7/27/07 | 250 | $46.5930 |
| 11/8/06 | 1,100 | $37.5869 | | 7/30/07 | 100 | $46.8229 |
| 11/9/06 | 1,150 | $37.0644 | | 7/31/07 | 400 | $47.2462 |
| 11/9/06 | 50 | $37.3623 | | 8/6/07 | 750 | $43.7740 |
| 11/10/06 | 1,150 | $37.1745 | | 8/7/07 | 500 | $44.0776 |
| 11/13/06 | 950 | $37.4931 | | 8/8/07 | 150 | $47.0000 |
| 11/14/06 | 450 | $37.2487 | | 8/8/07 | 150 | $47.1159 |
| 11/14/06 | 200 | $37.1753 | | 8/9/07 | 1,150 | $47.8387 |
| 11/15/06 | 50 | $37.5046 | | 8/20/07 | 1,150 | $45.0400 |
| 11/21/06 | 900 | $37.7732 | | 10/18/07 | 250 | $35.1451 |
| 11/21/06 | 300 | $37.7811 | | 10/22/07 | 500 | $34.2784 |
| 11/22/06 | 200 | $38.1852 | | 11/6/07 | 1,100 | $31.5407 |
| 11/24/06 | 50 | $38.3358 | | 11/7/07 | 250 | $31.0516 * |
| 11/27/06 | 750 | $38.0398 | | 11/8/07 | 850 | $30.6749 * |
| 11/28/06 | 500 | $38.0569 | | 11/9/07 | 850 | $32.3975 * |
| 11/29/06 | 550 | $38.0679 | | 11/12/07 | 950 | $32.0843 * |
| 11/30/06 | 700 | $38.2993 | | 11/13/07 | 1,000 | $33.9881 * |
| 11/30/06 | 500 | $38.1000 | | 11/14/07 | 1,000 | $34.4419 * |
| 12/1/06 | 1,000 | $38.4305 | | 11/15/07 | 1,150 | $33.5753 * |
| 12/4/06 | 300 | $38.5157 | | 11/16/07 | 805 | $33.2925 * |
| 12/5/06 | 350 | $39.5251 | | 11/28/07 | 550 | $33.2415 * |
| 12/6/06 | 100 | $39.5907 | | 11/29/07 | 850 | $33.2682 * |
| 12/13/06 | 7,400 | $40.8638 | | 11/30/07 | 970 | $34.4128 * |
| 12/13/06 | 12,650 | $40.8638 | | 12/3/07 | 716 | $34.1535 * |
| 12/19/06 | 50 | $40.6736 | | 12/4/07 | 600 | $33.9701 * |
| 12/21/06 | 1,050 | $40.8266 | | 12/5/07 | 210 | $34.8231 * |
| 12/22/06 | 550 | $40.9303 | | 12/6/07 | 1,150 | $35.8190 * |
| 1/3/07 | 1,250 | $40.7422 | | 12/6/07 | 400 | $35.9632 * |
| 1/4/07 | 1,100 | $40.9489 | | 12/7/07 | 500 | $36.5164 * |
| 5/2/07 | 50 | $50.9750 | | 12/10/07 | 900 | $37.1497 * |
| 5/3/07 | 950 | $49.6933 | | 12/11/07 | 700 | $37.0615 * |
| | | | | 12/12/07 | 50 | $35.4942 * |
| | | | | 12/21/07 | 350 | $33.7955 * |

**First American Corporation**
**Class Period:  April 27, 2006 through November 6, 2007**
**Berks County Employees' Retirement Fund**

| ----------------------Purchases---------------------- | | | | -----------------------------Sales----------------------------- | | |
| Trade Date | Shares | Price | | Trade Date | Shares | Price |
|---|---|---|---|---|---|---|
| | | | | 12/24/07 | 500 | $35.2511 * |
| | | | | 12/26/07 | 500 | $35.1528 * |
| | | | | 12/27/07 | 650 | $34.8812 * |
| | | | | 12/28/07 | 350 | $34.2833 * |
| | | | | 12/31/07 | 450 | $34.0279 * |
| | | | | 1/2/08 | 399 | $33.7000 * |

*Shares sold within 90 days after the end of the class period are calculated at the higher value between the actual sales price and the average closing price from the end of the class period to the date of sale.*